CHATFIELD v. IOWA & ARKANSAS LAND COMPANY.

Opinion delivered November 16, 1908.

1. TAXATION—REFORMATION OF TAX DEED.—Under Kirby's Digest, § 7116, providing that where a tax deed shows two or more tracts of land were sold at delinquent tax sale for a lump sum when in fact they were sold separately, the county clerk, "upon the presentation to him of such deed and being satisfied from the records of his office that said tracts of land were sold separately, shall file said deed in his office and cancel the same, and shall thereupon execute in lieu thereof a deed for said land, reciting * * * * that each tract was sold separately," etc., *held*, that the clerk can reform a tax deed only when he is satisfied from the records in his office that the several tracts of land were sold separately. (Page 401.)

2. SAME—SALE OF SEVERAL TRACTS FOR LUMP SUM.—A tax sale of several tracts of land for a lump sum is void. (Page 402.)

3. SAME—WHEN PAYMENTS OF TAXES NOT ADVERSE.—Kirby's Digest, § 5057, providing that one who pays taxes on unimproved lands shall be deemed in possession, does not apply to payments made by the agent of one claimant by consent of the agent of an adverse claimant during the pendency of negotiations looking to a compromise between the parties. (Page 402.)

4.  EQUITY—LACHES.—As the holder of the record title to unimproved
    and uninclosed land is presumed to be in possession thereof, mere
    delay upon his part in suing to quiet his title does. not constitute
    laches, as there is no duty or necessity for resorting to legal or equit-
    able remedies until some one threatens to destroy or impair his pos-
    session or right to the land.   (Page 404.)

Appeal from Cross Chancery Court; *Edward D..Robertson,*
Chancellor; affirmed.

### STATEMENT BY THE COURT.

On the sixth of November, 1905, A. H. Chatfield, trustee,
brought this suit, in the Cross Chancery Court, against the Iowa
& Arkansas Land Company to quiet title to certain lands, all
of which are wild and uninclosed.  He states that these lands
were sold by the collector of taxes of Cross County on the 11th
day of March, 1867, for taxes, penalty and costs due on the same
for the year 1866, to E. H. Porter, and the same, not being re-
deemed, were conveyed to him; and he (Porter) and his wife
conveyed them to the Memphis & St. Louis Railway Company
on the 11th day of June, 1873; and it conveyed them to William
H. Chatfield, trustee, on the 31st day of May, 1883; and he (Chat-
field) died on the 13th day of May, 1889, leaving plaintiff, A. H.
Chatfield, and Mary Chatfield Gilbert, his only heirs; and Mrs.
Gilbert conveyed all her interest in the lands to A. H. Chatfield
on the 11th day of July, 1889, and since that time plaintiff has
paid all the taxes on the lands, except for the year 1888, which
were paid by the defendant.  He further alleges that since Porter
purchased at the tax sale he and those under whom he claims
have been in absolute control of these lands; and the defend-
ant is seeking to annoy and disturb him by claiming title and
attempting to sell the same.

Defendant answered and denied that any part of the lands
were sold on the 11th day of March, 1867, for the taxes of 1866;
that plaintiff is now or ever has been in the possession of these
lands; that plaintiff paid taxes thereon for seven successive years;
and alleged that it, the defendant, paid taxes from the 9th of
January, 1900, to thirteenth of July, 1905, under a special ar-
rangement with plaintiff's agent, under which the taxes were to
be repaid according to interest of parties.  It alleged as follows:
that the lands were swamp and overflowed, and were granted

by Congress to the State of Arkansas. They were conveyed by the State to Barnett Graham on the first day of December, 1860. On the 27th day of May, 1883, the widow and heirs of Graham, he being dead, conveyed to George W. Miller. On the 6th day of August, 1883, Miller conveyed to Charles Paxton, trustee; and he and the beneficiaries of the trust in which he held conveyed to the defendant on the 4th day of January, 1889; and by virtue of these conveyances it claims to be the owner of the lands. It asked that the allegations of its complaint be taken as a cross-complaint against the plaintiff, and that its title to the lands in controversy be quieted.

Plaintiff answered the cross-complaint, and alleged that he paid taxes on the lands for seven sucessive years, three of which were prior to the act of March 18, 1899, and four subsequent, and pleaded this in bar of defendant's right to recover.

Plaintiff and defendant entered into the following agreement, which was read as evidence in the hearing of this cause:

"It is agreed between plaintiff and defendant in this cause to be used as evidence that the lands in the complaint are what is known as swamp and overflow lands, and as such were granted to the State of Arkansas by act of Congress.

"That the lands were by the State sold to Barnett Graham, then a resident of the city of Memphis, in the State of Tennessee, and said lands were patented to said Graham.

"That said Barnett Graham departed this life intestate, and his heirs at law, all residents of said city of Memphis, conveyed said lands by deed duly executed, acknowledged and recorded May 27, 1883, to one George W. Miller.

"That said George W. Miller, by deed duly executed, acknowledged and recorded, conveyed said lands to Charles Paxton, trustee, August 8, 1883.

"That said Charles Paxton, trustee, by deed duly acknowledged and recorded, conveyed said lands to the defendant, Iowa & Arkansas Land Company, January 4, 1889.

"It is further agreed that E. H. Porter, to whom the tax deed in question was made under which plaintiff claims, died August 17, 1881."

Herbert Tonney testified as follows: He was the secretary of the defendant. M. M. Arnold was State agent, and L. C. Balch was agent of plaintiff.

"In the spring or summer of 1900, Mr. L. C. Balch, Mr. M. M. Arnold and myself met at the Capital Hotel, in Little Rock, Arkansas, and there were suggestions made as to clearing up the title to these lands (lands in controversy). The substance was that we ought to settle the matter of title in dispute, and I suggested that as both had paid taxes we ought to have three-fifths interest. Balch suggested one-half interest, saying that he would advise a settlement on that basis; and we left with the understanding that it was settled, as far as that was concerned, and that he would report later. Balch was to submit the proposition to Chatfield. In a second conversation with L. C. Balch in the first part of December, 1900, Balch, Mr. Arnold, and I met again at the Capital Hotel in Little Rock, and talked the matter over again. Balch said he had been sick, and had not been able to take the matter up with Mr. Chatfield, but said he would advise the settlement as heretofore agreed upon between us. The question then arose about taxes. We had been trying to pay the taxes prior to that time. We found there was going to be trouble in paying taxes, and Mr. Balch said they would pay the taxes, and later on we could settle; that there was no use squabbling about the matter."

M. M. Arnold testified: "I was present with Mr. L. C. Balch and Mr. Herbert Tonney at the Capital Hotel. My recollection is that it was in the spring of 1900—sometime in March, I think. We all talked and made suggestions as to what kind of settlement ought to be arrived at. Balch said he was anxious to have a settlement, and get the matter disposed of. The result of it was, at that time, that we would settle it on the one-half basis, which we all agreed was fair. Mr. Balch said he understood the history of both titles. Mr. Tonney and I thought under the circumstances that the Iowa & Arkansas Land Company should have three-fifths. Mr. Balch said something about the sale to be made, and he wanted three-fifths of what it brought and the taxes, which were to be paid, were to be taken out of the returns from such sale. He did not agree to the three-fifths to the Iowa & Arkansas Land Company. Spoke of them not

accepting it.   But all were busy talking about the tax matters, and we did not discuss the matter after that.   Said he would advise a settlement on the one-half basis.   We finally agreed to it.   We were to get up the tax matters.   In the meantime he was to correspond with Mr. Chatfield, and ascertain what we were to get out of it in the event of a sale, and we were to settle upon in the meantime, whether we were to have one-half or one-third, but he didn't seem to think he, Mr. Chatfield, would give us over one-half  *  *  *  *  We were to deduct first the amount of taxes which he had paid out.   We had two conversations at the Capital Hotel that I remember.   In the last one we got down to the proposition that we would divide even.   I was present in the early part of December, 1900, at a talk between Mr. Balch and Mr. Tonney concerning the payment of future taxes on these lands.   Mr. Tonney and Mr. Balch did most of the talking at that time.   Mr. Tonney asked what about the taxes.   He said, 'I have paid part of the time, too.'   Mr. Balch said, 'I think, Mr. Tonney, you had better let things run along the same.   You can pay the levee taxes, and we can pay the other taxes.   We can do this until we settle up.'   And they agreed upon that.   I understand in all conversations up to the last one in December, 1900, that Mr. Balch would have to submit the matter to Mr. Chatfield."

From this testimony we infer that the proposition that the agents of both parties agreed to submit to Chatfield for approval or ratification was:   "That each should proceed to try to find a purchaser for the lands ; and if sold each should be refunded the taxes" he or it had paid, "and the balance should be equally divided."

A. H. Chatfield testified:   L. C. Balch or R. W. Balch had no authority to "settle" a claim of any party to the lands mentioned in his complaint in this action; and that he never ratified or approved any agreement between L. C. Balch and the defendant, or any one in its behalf, whereby the defendant was recognized as having any interest in the property mentioned in the complaint; and no such agreement was submitted to him for approval; and no such agreement was made by him.

Plaintiff offered by letters and telegrams to purchase defendant's interest in the lands in controversy by payment of certain

sums, all of which it declined, and offered to sell for $10,000, which plaintiff refused to give. Propositions were pending until the fourth of March, 1905, when plaintiff withdrew all propositions, and ended negotiations.

The plaintiff paid county and State taxes on the lands in controversy from the year 1883 until the commencement of this suit, except the taxes of 1888 and 1890, which were paid by the defendant.

Both parties, plaintiff and defendant, concede and insist that there was no agreement as to division of lands or proceeds.

The court dismissed plaintiff's complaint for want of equity, and decreed that defendant's title to the lands in controversy be quieted as against plaintiff; and that defendant within six months pay to plaintiff the sum of $1,929, the amount of taxes paid by him on the lands, and made it a lien on the lands. Plaintiff appealed.

*Joseph W. O'Hara, T. E. Hare* and *R. W. Balch,* for appellant.

1. The act of March 18, 1899, is constitutional, and has become a rule of property. Kirby's Digest, § 5057; 74 Ark. 302; 78 *Id.* 95.

2. Levee assessments are not *taxes.* 158 Fed. 250; 86 Ark. 109; 65 Ark. 498, 503; 59 *Id.* 513, 531; 43 *Id.* 82; 38 *Id.* 514; 34 *Id.* 166; 26 *Id.* 523; 21 *Id.* 40.

3. Appellant has color of title, though the tax deeds be void. 47 Ark. 528; 67 *Id.* 102 U. S. 461; 18 How. 56; 2 Words & Phrases Jud. Def. 1264-1272; 71 Md. 283; 24 C. C. A. 397; 10 Fed. 531-6; 37 W. Va. 215; 61 Wis. 615; 72 Ala. 77-8; 77 Cal. 485; 16 Ill. 424; 102 Ind. 330. A tax deed regular on its face is *prima facie* evidence of the regularity of the tax forfeiture and sale. 59 Ark. 195; 35 *Id.* 505; 32 *Id.* 131; 22 *Id.* 556.

4. Records not required by law but kept for convenience are not competent as public records. 135 U. S. 109; 131 Ala. 286; 143 Mass. 77; 90 Minn. 239; 64 Neb. 39; 173 N. Y. 374; 57 N. Y. Supp. 794; 10 Enc. Ev. 722. All presumptions are in favor of the acts of a public officer on collateral attack. 22 Ark. 556; 43 *Id.* 243; 35 *Id.* 81.

5. Appellee and its predecessors are barred by *laches.* 81 Ark. 352; 139 U. S. 380; 81 Ark. 432; 3 Brown, Ch. 638.

*O. N. Killough* and *John B. Jones,* for appellee.

1. Where a clerk's tax deed recites that the tracts of land therein named were sold altogether and for a lump sum, and the fact is that they were sold separately, the clerk is, nevertheless, authorized to cancel that deed and execute another in lieu thereof, making the proper recitals, *only when he is satisfied from the records in his office* that the tracts of land were sold separately. And when no such record exists, the subsequent deed is void. Kirby's Digest, § 7116. The first deed was also void. A tax deed that shows on its face that two or more tracts of land were sold for a lump sum, is void. 83 Ark. 174; 29 Ark. 476; 31 Ark. 491. Where, as in this case, the clerk has failed to make a record of tax sales separate from the delinquent list, the tax sale is void. 84 Ark. 316; Gould's Digest, § 123, c. 148.

2. The claim of title under the seven years' payment of taxes act cannot be sustained under the evidence in this case. As, under the statute giving title by seven years' adverse possession, there must be open, continuous, hostile possession for the required time with intent to hold adversely to the original owner, so under this statute the payment of taxes must have been hostile to the other claimant of title, and must have been continuous for seven years in succession under color of title. The principle underlying the two acts is the same. 68 Ark. 553; 29 Conn. 391; 97 Iowa 247; 150 U. S. 597; 11 Pa. St. 212; 4 Wend. 508; 5 T. B. Mon. (Ky.) 531; 17 Am. Dec. 109; 43 Fed. 31; 74 Ark. 314.

3. There is no merit in the claim of laches. The same evidence that defeats the claim of limitation by payment of taxes also defeats the claim that appellee is barred by laches.

BATTLE, J., (after stating the facts.) Appellant claims under a deed executed by the clerk of the county court of Cross County on the 17th day of March, 1903. That deed recites that "on the 11th day of August, 1883, there was executed and issued by the clerk of the county court of the county of Cross, in the State of Arkansas, a clerk's tax deed for the following described lands: All of section 3, three, all of section 4, four, and all of section 5, five, all in township six, 6, north range five, 5, east, in Cross County, Arkansas, to one E. H. Porter of the county of Shelby, State of Tennessee;" and it is stated in that deed "that the said tracts of land were sold altogether and for a lump sum, when

the fact is they were sold separately;" and the clerk of the county court of Cross County proceeded to correct the error by the execution of the deed on the 17th day of March, 1903. But that deed was made without authority. The statute in such cases provides that "the clerk of the county court of the county in which said lands were sold, upon the presentation to him of such deed, and being satisfied from the *records of his office* that said tracts of land were sold separately, shall file said deed in his office and cancel the same, and shall thereupon execute in lieu thereof a deed for said land, reciting the execution of the former deed and the date thereof, the error therein, that each tract was sold separately, and the amount for which the same was sold, and in all other respects conform to the requirements of law." Kirby's Digest, § 7116. According to this statute, it is only when the clerk is satisfied *from the record in his office* that the tracts of land were sold separately that he is authorized to execute a deed in lieu of the first, making proper recitals. In this case there was no such record as to how the lands were sold, and no authority to execute the deed of March 17, 1903, and it is void. In many other respects the records of the county clerk's office of Cross County fail to show a valid sale of the lands in controversy for taxes of 1866.

The deed of March 17, 1903, having been executed without authority of law, the deed of the 11th day of August, 1883, remains in force, and it shows that the lands in controversy were sold together for the taxes of 1866; and, such being the case, the sale is void. *LaCotts* v. *Quertermous,* 83 Ark. 174, and cases cited.

It is evident, therefore, that appellant acquired no title by conveyances, the tax deed which is the basis of his title being void.

Appellant contends that he is entitled to hold the lands in controversy under an act entitled "An act for the protection of those who pay taxes on land," approved March 18, 1899. That act provides: "Unimproved and uninclosed land shall be deemed and held to be in possession of the person who pays taxes thereon if he have color of title thereto; but no person shall be entitled to invoke the benefit of this act unless he and those under whom he claims shall have paid such taxes for at least seven years in

succession, and not less than three of such payments must be made subsequent to the passage of this act." Kirby's Digest, § 5057. Is he so entitled to hold?

Appellant and appellee claimed title to the lands in controversy. In the spring or summer of 1900, L. C. Balch, Tonney and Arnold met at the Capital Hotel, in Little Rock, for the purpose of adjusting their differences, and it was proposed to divide the lands equally, and that this proposition should be submitted to Chatfield for approval; Balch not having the authority to make the agreement. In December, 1900, they met again at the Capital Hotel, and it was agreed that a proposition to sell the land, and that each claimant should receive out of the proceeds the taxes paid by it or him, and that the balance be equally divided between them, should be submitted to Chatfield for ratification. Tonney, then agent of appellee, wanted to know what should be done in the meantime about taxes. He said: "I have paid a part of the time, too." Mr. Balch said: "I think, Mr. Tonney, you had better let things run along the same. You can pay the levee taxes, and we can pay the other taxes. We can do this until we settle up." And they agreed upon that. This agreement as to taxes was entered into after it was agreed that the proposition as to lands should be submitted to Chatfield. The effect of this was that Balch, who was the agent of Chatfield to pay taxes on his lands in Arkansas, should pay the State and county taxes on the lands in controversy until they should adjust their differences, or until it should be finally decided that they would not do so. Until that time Balch was the agent of both parties to pay the taxes, and the true owner of the land became liable for the taxes when there was a final failure to compromise. Negotiations by letter and telegram to compromise were thereafter entered into, appellant proposing to purchase appellee's interest in the lands and appellee to sell, and each one rejected the offer of the other until the fourth of March, 1905, when Chatfield withdrew all propositions, and ended negotiations. Until that time Balch was to pay State and county taxes for both parties, and continued to do so until he died in 1904, and the true owner became liable for the full amount of the same. There is no evidence that Chatfield ever accepted or approved the proposition Balch, Tonney and Arnold agreed to submit, but there is evidence that he did not.

The negotiations and failure to agree and withdrawal of them corroborate such evidence.     •

The payment of taxes, (we mean State and county taxes, and not levee assessments) under the agreement of the agents of the parties was not hostile to appellee, and was not a payment of the taxes by appellant within the meaning of the act of March 18, 1899; and the taxes on the lands were not paid for at least seven years in succession, three of which not being subsequent to the passage of the act, so he did not acquire title under that act.

Appellee is the true owner of the lands in controversy. He traces his title through an unbroken chain to the government of the United States.

But appellant says appellee has lost its right to the land by laches. Laches is an equitable defense, and the theory upon which it is sustained in equity is that "nothing can call a court of equity into activity but conscience, good faith and reasonable diligence; where these are wanting, the court is passive, and does nothing." In this case the appellant has brought·a suit to quiet title, and is indirectly seeking to use it for the purpose of establishing title. See *McFarlane* v. *Grober,* 70 Ark. 371; *Rowland* v. *McGuire,* 67 Ark. 320. It could not avail him as a defense to the cross complaint; for if it was dismissed he would have to sustain his complaint by proof of its allegations before he could prevail in this suit. Appellee is the owner of the lands. The lands are wild and unoccupied. They are in the constructive possession of the appellee. Appellant has acquired no title to·them. There is no duty or necessity for resorting to legal or equitable remedies to establish its right until some one threatens to destroy or impair it; and that he has done in this case. See *Penrose* v. *Doherty,* 70 Ark. 256.

The decree is affirmed as to all the lands in controversy, except so far as appellee confesses error, and as to the land excepted it is reversed, and the cause is remanded with directions to the court to quiet appellant's title to it as against appellee.

HILL, C. J. and McCULLOCH, J. (dissenting.) As stated by Mr. Justice BATTLE, the respective agents of the parties agreed "that each should proceed to try to find a purchaser for the lands; and if sold each should be refunded.the taxes he or it had paid, and the balance should be equally divided."

The land company's agent seemed possessed of full authority; there is no question on that score, and the case turns on Chatfield's ratification. If he did not ratify it, then the whole agreement should go for naught. It was not a separable agreement, but an entirety. Its two subject-matters, tax paying and a division of the proceeds from sale of the land, were interdependent. It is true that a division of the land was first agreed upon by the agents, but, owing to Mr. Balch's illness, the agreement was not submitted to Chatfield when Balch met Tonney and Arnold at the second conference at the Capital Hotel and the whole matter gone over again and the tax payment agreement also reached. It was added to the former agreement, as the taxes were to be refunded from the proceeds of the lands when sold and the balance equally divided and the whole to be submitted to Chatfield for approval. There was no agreement for their payment otherwise than through the sale of the land.

If the agreement was not ratified by Chatfield, no more effect should be given to one part of it than the other. It did not purport to have life of itself. It had to be approved by Chatfield before it was brought into being. Without Chatfield's approval, it was mere amicable conversation between gentlemen desirous of avoiding a lawsuit.

But we think the evidence shows ratification by Chatfield, even in the face of his denial. Mr. Balch evidently put the whole matter fully before him. Norton, the president of the land company, put it fully before him in a letter of July 13, 1903. The evidence shows it was repeatedly put before him, and no dissent is found from him. He subsequently recognized the interest of the land company in efforts to purchase their half interest.

This conduct is inconsistent with any other fact than that L. C. Balch's agreement as to tax paying and division of the lands was approved. It cannot be explained as a compromise of disputed titles, for Chatfield and R. W. Balch refer in these negotiations to their half interest; language entirely inconsistent with a compromise of disputed titles and entirely consistent with a ratification of Balch's agreement. This would in equity be an enforceable agreement. Each party should have a half interest.

Holding these views, we cannot concur in the opinion.